# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**RANDALL L. PHIPPS,**                                CASE NO. 3:21 CV 1193

      Plaintiff,

      v.                                        JUDGE JAMES R. KNEPP II

**WIELAND CHASE, LLC,**

      Defendant.                               **MEMORANDUM OPINION AND ORDER**


### INTRODUCTION

Currently pending before the Court in this age and disability employment discrimination action is Defendant Wieland Chase, LLC's Motion for Summary Judgment (Doc. 27). Plaintiff Randall L. Phipps opposes (Doc. 35), and Defendant replies (Doc. 36). With the Court's leave, Plaintiff also filed a sur-reply (Doc. 39), Defendant responded thereto (Doc. 40). And again with the Court's leave, Plaintiff filed a further response (Doc. 44). Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367. For the reasons discussed below, Defendant's motion for summary judgment is granted.

### BACKGROUND

Plaintiff has worked for Defendant since 1997 and is currently employed by Defendant as a Caster Helper; he works first shift, from 7:00 a.m. to 3:00 p.m., Monday through Friday. (Plaintiff Depo., at 9, 43-44).[1] A Caster Helper "charg[es] the furnaces, correct[s] furnaces, pour[s] the furnaces . . . [and] run[s] an air hammer." (Plaintiff Depo., at 10). A Caster Helper is a step below the position of Lead Caster (also sometimes just called a "Caster"). *Id.* at 10-12.

---

1. Plaintiff's Deposition is located at ECF Doc. 28-1. Citations herein are to the deposition page numbers, not the ECF page numbers.

Plaintiff is, and has at all relevant times been, a member of the United Steel, Paper, and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW") and USW Local Union 7248 ("the Unions"). *Id.* at 21. Plaintiff's employment is governed by a Collective Bargaining Agreement ("CBA") between Defendant and the Union.

Prior to his current position, in 2018, Plaintiff was employed as a Lead Caster on the B Crew weekend shift, from 11:00 a.m. to 11:00 p.m. on Saturday and Sunday. (Plaintiff Depo., at 12-18). Prior to that, Plaintiff worked as Lead Caster on a weekday shift for several years. *Id.* at 11-12.[2]

The B Crew consists of Lead Caster, Caster Helpers, and a few other employees. (Downing Depo., at 9-10).[3] Kris Downing was the Supervisor of the B Crew. *Id.* at 6. While Plaintiff worked as Lead Caster on B Crew, there were typically three to four Caster Helpers. (Plaintiff Depo., at 18-20); (Eisel Depo., at 11, 35-36). But it varied, and "[i]t could go down to one if we had a bad weekend where a lot of people took off." (Plaintiff Depo., at 20); (Plaintiff Depo., at 35) ("There was times where it got down to one."). During the time Plaintiff was Lead Caster on B Crew, there were more Caster Helpers assigned to B Crew than A Crew on the weekends. (Plaintiff Depo., at 160-61, 162). Downing testified that in 2020, the Lead Caster on A Crew often worked alone; at some point he received two Caster Helpers. (Downing Depo., at 24); *see also* Plaintiff Depo., at 90 (testifying that he did "everything else . . . pretty much" because the A Crew Lead Caster "wasn't allowed to do any heavy lifts because there was no other person out there."); (Eisel Depo., at 9 ("we walked into quite a mess on Saturday morning

---

2. Defendant runs three shifts during the weekdays, and then an "A Crew" (11:00 p.m. to 11:00 a.m. Friday and Saturday) and "B Crew" on the weekends. *Id.* at 10.
3. Kris Downing's deposition transcript is located at Doc. 29-1.

because no work was being performed on A shift because [the Lead Caster] was there by himself, and they would not let him work by himself."). The Lead Caster on the A Crew was older than Plaintiff. (Plaintiff Depo., at 163)

Plaintiff requested (from Downing, his shift foreman) that additional Caster Helpers be added to his shift. (Plaintiff Depo., at 158). He testified:

> Q: And in what context would you ask, just to help with the amount of work?

> A: Yes, and we're missing people. He would know sometimes a week ahead of time that, hey, Jeff is going to be off or Bostic is not going to be there, somebody is not going to be there. We didn't see what happened with Johnny coming, but are we going to get some help? You know, and they just refused to offer it because there would have been people coming it because it was good pay.

*Id.* at 158-59. Plaintiff testified that after John (or Johnny) Krisher passed away, "the company refused to fill the open position with overtime" despite his requests for help. *Id.* at 157-58. Plaintiff further testified:

> A: And we just slowly kind of started losing more and more people. Obviously Johnny passed away and then we had Jeff was very frequently taking off because of physical issues with his knee or something, I believe. And he was preparing for retirement anyway. Joe retired, you know, and so we got down to where it was a very short staff.

> Q: And I think you said earlier that in the time you were doing the weekend Lead Caster position there would be anywhere from typically one to four Caster Helpers on there with you?

> A: I would say so, yeah. There was times where it got down to one. It was just me and Brian or something like that. And, and we would do the best we could as far as getting the thing turned around.

*Id.* at 35.

<u>Injuries / Medical Conditions</u>

The parties agree that during Plaintiff's employment with Defendant, he suffered a variety of work-related injuries including burns to his right foot and right wrist in 1998 and 2001,

3

respectively; a back injury in 2014, surgery on a finger in October 2015, and a hernia in December 2019. (Plaintiff Depo., at 133-37); *see also* Ex. 21, Plaintiff Depo., at 27-3, at 26 (Plaintiff's Responses to Interrogatories). Plaintiff discussed his back condition with Kris Downing, and at one point "had a med check from Jason Amstead" after he told him about a recent medication change and not feeling well. (Plaintiff Depo., at 145). Plaintiff also "believe[s] Mike Tisovic knows" about his back condition, even though Plaintiff did not think he "outright discussed it with him." *Id.* at 145-46. The basis for this belief was Tisovic asked him about his medications at one point. *Id.* at 146. After Plaintiff's most recent surgery (for a hernia) in December 2019, he returned to work with no restrictions. *Id.* at 143.

Plaintiff was diagnosed with reactive depression in December 2016 and generalized anxiety disorder in June 2018. (Plaintiff Depo., at 135-36). When asked if he had told anyone in Defendant's management about his anxiety and depression, he responded: "Not directly, no. I think they know the same thing, there's days where I feel like I'm wired just from all the anxiety and stuff and, I'll be, I guess I work harder and faster." *Id.* at 147. When asked if his anxiety and depression interfered with his abilities to perform the duties of a Caster or Caster Helper, Plaintiff responded: "No. Actually, I think the jobs kind of wear me down to the point where I don't, I don't feel nearly as much . . . . I just, you know, by working I wear myself down a little bit, having anxiety and stuff I do extra stuff, do some things and by the time I'm done I'm usually feeling pretty normal." *Id.* at 148.

Performance / Discipline Issues

In October 2019, Plaintiff received a "Formal Counseling for Failure to Fulfill Job Responsibilities" after he admittedly failed to perform certain required tasks. (Plaintiff Depo., at 61-65); (Ex. 6, Plaintiff Depo., Doc. 27-3, at 5).[4]

In March 2020, Plaintiff received another Formal Counseling for failure to wear proper personal protective equipment during a task. (Plaintiff Depo., at 37-38); (Ex. 7, Plaintiff Depo., Doc. 27-3, at 6). Plaintiff testified this discipline was issued despite exceeding the length of time Defendant was permitted to use video monitoring to issue discipline. (Plaintiff Depo., at 69).

In July 2020, Plaintiff was disciplined for documenting inspections he had not performed. (Plaintiff Depo., at 70-71); (Exs. 8-9, Plaintiff Depo., Doc. 27-3, at 7-8). He received a verbal warning for failure to perform the task and a written warning for falsification of a company document. (Ex. 8, Plaintiff Depo., Doc. 27-3, at 7). This related to Plaintiff's failure to physically check the temperature of a freeze pocket; Plaintiff admitted he did not do so, yet recorded that he had. (Plaintiff Depo., at 25-26, 70-71)

Additionally, Defendant asserts multiple other employees complained about Plaintiff's performance. Downing testified that he got complaints about Plaintiff's "[l]ack of involvement in helping others, dragging his feet, wanting help to do his job" from Brian Bostic, Bob Eisel, Tony Ridgway, Al Ruiz. (Downing Depo., at 45). Michael Tisovic, Defendant's Plant Manager, testified he "became aware of complaints" about Plaintiff, but could not remember if it was before or after Plaintiff's October 2020 disqualification. (Tisovic Depo., at 24). B Crew Lab Technician Jessica Hartung testified that she heard concerns from other employees about

---

4. Plaintiff cites his testimony that he thinks he went 23 years without a write up (Plaintiff Depo., at 153), and argues that "when he grew older, and suffered a hernia, he was watched under a microscope." (Doc. 35, at 3). Defendant points out that this write up occurred prior to Plaintiff's hernia surgery.

5

Plaintiff's job performance, specifically about safety, lack of communication, lack of leadership. (Hartung Depo., at 28-30, 34-36, 53). The Casting Superintendent, Nelson Turner testified Phipps' issues included "consistent shortcomings in getting the work performed that needed to get done and getting the foundry up and running in a timely manner" and that he "wasn't meeting the standard that was set forth". (Turner Depo., at 15-16).

When asked how the company discriminated against him based on his age, Plaintiff testified that he believed the company monitored him by video:

> I believe they did by watching video and seeing me going up and down stairs numerous time by myself and yet I get sore by the end of the night, I'm very sore but I push through it and, but I think they are thinking he got hurt this time, he's going to get hurt again and get him off the shift.

(Plaintiff Depo., at 165). However, when asked if he knew for a fact anyone watched him, he said, "No, that's, I know nothing about their camera system or who monitors or who makes decisions. I know it's a constant thing of people being written up for being on their phones and stuff and this is video supported." *Id.* at 166.

Disqualification

Defendant disqualified Plaintiff from the Lead Caster position on October 11, 2020. (Ex. 11, Plaintiff Depo., Doc. 27-3, at 15). This decision was made by Turner, Tisovic, Ed Williams (the Vice President of Manufacturing), and Russ Patton (Labor Relations Manager). (Turner Depo., at 15). The Letter of Disqualification cited Plaintiff's "ineffective ability to direct his work crew as a Lead Caster, failure to follow directions, and "his lack of comfortability to start up the Horizontal Foundry when directed to do so." (Ex. 11, Plaintiff Depo., Doc. 27-3, at 15). It cited Plaintiff's "lack of confidence in himself", "failing to fulfill his responsibilities by way of walking off the job", and "working on equipment in an inefficient way ultimately putting others at risk in addition to causing additional down time." *Id.*

Plaintiff testified he "did not agree with any of" the reasons provided for his disqualification. (Plaintiff Depo., at 83). When asked if he, as a Lead Caster, had the responsibility for directing a work crew, Plaintiff responded that he did not because

> They knew their jobs I had no reason to direct them unless something. . . . So no, I did not direct them. I directed them just to the point and 99 percent of the time the only time I came out of that observation room was when one of them came in and said, hey, the auger is not working, hey, the stoker is not, we can't get the stoker to work so page me and wait. So no, I really didn't have to direct those guys, they are pretty, pretty much knew that when I had it to my point they could take off and do their job.

*Id.* at 83-84. He testified that he did not have occasion to direct the crew "unless we had to evacuate due to a bleed out or something like that." *Id.* at 84. This was because his crew was experienced. *Id.* ("I really did not do anything besides, like – these guys have been there a long time, it's a premium shift, they know what to do."). Plaintiff testified further:

Q:  So you didn't direct them what to do?

A:  No, I didn't feel – if you knew them they would impress you.

Q:  You didn't feel it was necessary for you to direct them what to do with things?

A:  No, because they weren't, at the time they done whatever Kris had told them as far as the North Foundry or moving scrap and doing everything else. Everything is set up. All I got to say is they want us to fire up and they knew to put the runways in, I knew what I had to do to get the thing ready. I called maintenance because we had to tap inductors differently. It was pretty straight forward.

Q:  So I'm just trying to make a clear record here and I just want to ask this question again so it's nice and clear. As Lead Caster on the weekend shift you did not feel it was necessary for you to direct the other employees, yes or no?

A:  No.

Q:  No meaning I'm correct, it was not necessary?

> A:  It was not necessary because Kris is a good Foreman, when he said that we're going to start up the South Foundry those guys knew what to do
> .

*Id.* at 85-86. Plaintiff also testified he disagreed with the statement that he "failed to follow directives related to starting up the Horizontal Foundry" when told to do so. *Id.* at 86. However, he admitted that there were times when he failed to start up the Horizontal Foundry when directed to do so, but stated it was due to maintenance issues. *Id.* Plaintiff further testified he never expressed a lack of confidence in starting up the Foundry. *Id.* at 87.

As to walking off the job, Plaintiff admitted he did so. *Id.* He explained:

> That occurs when they come out, they know what their jobs are, they got to put the runways in. I'm still being held to the, I've got to go to the North Foundry and check things and do stuff before I start up and I have to do jobs, and walking away, I wouldn't call it walking away. A lot of times it was just going down to make sure everything was exactly right before the start up because it's too late.

*Id.* at 87-88.

When questioned about "working on equipment in an inefficient way ultimately putting others at risk in addition to causing additional down time for this inefficient behavior", Plaintiff responded that he had "no idea" what this was referring to. *Id.* at 93. He stated he tried to ask about this "at the third step when they disqualified me but they said it was a done deal". *Id.*

At his deposition, when asked why he believed the reasons for his disqualifications to be false, he stated: "Because I did my job and I did my job right and I did it very good, I think. And you know, none of this makes any sense to me, even now of why this occurred." *Id.* at 121. When asked specifically to identify what about the reasons for disqualification were false, Plaintiff testified as follows:

> Q:  But, sir, it says the reasons given for my removal were false, that indicates that you were given reasons that you believed were false. And my question to you is what are those reasons that are being referred to in here?

8

A:     I'm just going to go back through here because as I told you before the, on Exhibit 11 the lack of willingness to start the foundry up due to the lack of confidence, failing to fulfill his responsibility by way of walking off the job, working on equipment in an inefficient way ultimately putting others at risk. I don't agree with any of that, that's why it's false.

Q:     So those are the reasons being referred to in this document?

A:     That's part of the reason, yes.

Q:     What else?

A:     Well, what else would be? I was replaced by a younger man and it was immediately given another young man who was a caster Steve [Rau].

Q:     Was that a reason given for your removal?

A:     Was what a reason?

Q:     I'm asking you about a very specific and simple question. There is this document we marked as Exhibit 19 on page two it says the reasons given for my removal were false. My very specific question to you is what reasons is that referring to? You've identified some by reference to another exhibit, the Letter of Disqualification. Now you're saying that you were replaced by someone younger, is that a reason that was given to you for your removal?

A:     It was not given to me that that is how I, I took it because I had been refused help time and time again.

Q:     Okay. But I'm asking about the reasons. Are there any other reasons referenced in this document, Exhibit 19, other than what you've already mentioned?

A:     No, I don't believe there is.

*Id.* at 121-23.

After Plaintiff was no longer in the Lead Caster role, he "was put on second shift as a general labor" for a few weeks; he then bid on and obtained his current Caster Helper position. (Plaintiff Depo., at 43-44); *see also* Ex. 11, Plaintiff Depo., Doc. 27-3, at 15.

At some point after Plaintiff was disqualified, he testified to the following exchange with Turner:

> Q:   Now you've got Nelson Turner listed here as someone who discriminated against you on the basis of your age or disability. What did Mr. Turner do?
>
> A:   The only thing I can tell you is one time when we were doing the changing a stoker in the North Foundry is he came off and, yeah, I'm sweating and it's hard to breathe, and he says you're getting too old for this, man, and slapped me on the back. And I kind of, after having to deal with this that's kind of a kick to me.
>
> Q:   When was this?
>
> A:   I couldn't tell you the exact date, I don't know.
>
> Q:   Was it before or after you were disqualified?
>
> A:   Oh, this is after I was on first shift and I think he realized he had messed up because he kind of turned around and he came back and started kind of his little laugh, oh, you know, ha. Just didn't sit well with me.

(Plaintiff Depo., at 152).

<u>Replacement and Current Status</u>

Plaintiff was replaced by Keith Baker, a younger individual. Baker was selected through the CBA's contractual bidding procedures. *See* Downing Depo., at 33-34. Plaintiff testified he "was replaced by a younger man and he was immediately given another young man who was a Caster Steve [Rau]." *Id.* at 122; *see also id.* at 156-57 (stating that Defendant "immediately offered another Caster to help him complete tasks. Steve Rau was the Caster."). Plaintiff testified this went on "for more than a couple months where they just supplied an extra Caster." *Id.* at 157.[5] But when asked how long Rau worked on weekends, Plaintiff responded: "I don't know.

---

5. The Court notes that although Defendant characterizes this as Plaintiff's replacement having "an additional Caster Helper" (Doc. 36, at 8), Plaintiff's actual testimony is that his replacement was assigned an additional "Caster" (Plaintiff Depo., at 156-57), and Plaintiff elsewhere testified that a "Caster" is another way of saying "Lead Caster", (Plaintiff Depo., at 12).

That would have to be something we would have to question the company on. I'm sure they have his work hours." *Id.*

Currently, B Crew has only a single Caster Helper. (Eisel Depo., at 35); (Downing Depo., at 10); (Bostic Depo., at 8) (testifying he is the only Caster Helper currently assigned to B Crew). Bostic, who testified he has worked for over twenty years on B Crew, testified that the number of Caster Helpers has "slowly dwindled down' from three or four to just one. (Bostic Depo., at 8-9) ("Guys have retired, and they haven't filled the jobs."); *see also* Downing Depo., at 10-11 (testifying that when he first started, there were three Caster Helpers on the shift and now there is one).

Grievance

The day after his disqualification, Plaintiff and the Union filed a grievance. (Ex. 13, Plaintiff Depo., Doc. 27-3, at 16). Defendant initially denied the grievance on October 26, 2023. (Ex. 14, Plaintiff Depo., Doc. 27-3, at 17). After the meeting, Defendant again denied the grievance on November 13, 2020. (Ex. 15, Plaintiff Depo., Doc. 27-3, at 18); (Plaintiff Depo., at 108-13). After another meeting between Defendant and the Union, at which Plaintiff was present, Defendant and the Union agreed to settle the grievance on certain terms. (Ex. 16, Plaintiff Depo., Doc. 27-3, at 19). They agreed Plaintiff's performance in his Caster Helper role would be evaluated at 90 and 180 day increments from the date of disqualification; if his performance was acceptable, he would be allowed to begin training for the Lead Caster role. *Id.* Once the training was completed, he would be permitted to serve on the Lead Caster "Back-up list" and be qualified to bid on any open Lead Caster position. *Id.* The performance evaluations took place and Plaintiff became eligible to train for the Lead Caster position. (Plaintiff Depo., at

116-20); (Exs. 17-18, Plaintiff Depo., Doc. 27-3, at 20-21). Plaintiff was offered the opportunity

to train for Lead Caster but declined:

> Q:     Now at some point after this evaluation were you, in fact, offered the
>        opportunity to train for the Caster?
>
> A:     Yes. And I told them no because I wasn't just going to be their go to guy
>        and have to go through all this training which actually Jason Peck, the
>        Lead Caster was laughing because he says I would love to train you
>        because I won't have to do anything.
>
> Q:     So you turned down the opportunity to do the training?
>
> A:     Yes because I felt it was unfair and it's not based on what I did or
>        anything else. To, to retrain would be –
>
> Q:     And were you, is it your understanding that in order to get back to being a
>        Caster you would have to go through the training?
>
> A:     That, that's my understanding and I don't agree with it, not when we're
>        training new Casters all the time and I'm helping them out and even
>        helping my Caster out.

*Id.* at 119-20.

Dismissal of Claims Against Union

Plaintiff originally filed this action in June 2021, asserting a hybrid Section 301 claim

under the Labor Relations Management Act against Defendant and the Union. (Doc. 1). He

alleged a breach of contract claim against Defendant related to his disqualification, a breach of

the duty of fair representation claim against the Union, and a civil conspiracy claim against both.

*Id.*

Plaintiff amended his complaint in March 2022 to add age and disability discrimination

claims against Defendant. (Doc. 18).

In October 2022, Plaintiff dismissed with prejudice all claims against the Union. (Doc.

23).

12

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Id. The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

## DISCUSSION

Plaintiff asserts Defendant discriminated against him based on his age and disability. He identifies three purportedly adverse discriminatory actions: his disqualification from his position as Lead Caster, Defendant's heightened surveillance, and Defendant's refusal to assign additional Caster Helpers to his shift. Defendant argues it is entitled to summary judgment on each claim because Plaintiff cannot establish a *prima facie* case of age or disability

discrimination as to any of the three alleged discriminatory actions.[6] Further, Defendant asserts that even if Plaintiff could establish a *prima facie* case, Defendant has presented a legitimate, nondiscriminatory reason for its actions and Plaintiff cannot show pretext. For the reasons set forth below, the Court grants Defendant's motion for summary judgment as to all claims.

Discrimination Standards

*Age Discrimination*

The Age Discrimination and Employment Act ("ADEA") and the Ohio Civil Rights Act prohibit firing or otherwise discriminating against employees on the basis of age. 29 U.S.C. § 623(a)(1); Ohio Rev. Code. § 4112.14. Plaintiff must demonstrate "that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 178 (2009) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141–43, 147 (2000)).

Age discrimination claims under both the ADEA and Ohio law use the *McDonnell Douglas* burden-shifting framework. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012). The employee must first establish a *prima facie* case; the burden then shifts to the employer to establish a legitimate, nondiscriminatory reason for the adverse employment action; if it does so, the burden shifts back to the employee to establish pretext. *Id.*

To establish a *prima facie* case of age discrimination, a plaintiff must show: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). An allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the difference in age is significant. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003)

_____

6. Defendant additionally argues Plaintiff has not presented direct evidence of discrimination. Plaintiff's opposition brief does not refute this.

14

(explaining that an inference of discriminatory intent cannot be "drawn from the replacement of one worker with another worker insignificantly younger" (internal quotation marks omitted)).

*Disability Discrimination*

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Ohio law, Ohio Rev. Code § 4112.01 *et seq.*, prohibit discrimination on the basis of disability. Because the "analysis of claims made pursuant to the Americans with Disabilities Act applies to claims made pursuant to Ohio Revised Code § 4112.02[,]" this Court evaluates the Ohio claims "concurrently and under the same standards as claims brought under the ADA." *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 367-68 (6th Cir. 2013). Disability discrimination claims based on indirect evidence are subject to the same *McDonnell Douglas* burden-shifting framework set forth above. *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 325 (6th Cir. 2023). To establish a *prima facie* case of disability discrimination under the ADA, an employee must demonstrate that (1) he has a disability, (2) he is otherwise qualified for the job "with or without reasonable accommodation," (3) he "suffered an adverse employment decision," (4) his employer "knew or had reason to know" of his disability, and (5) his position remained open, or he was replaced. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566-67 (6th Cir. 2023) (quoting *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017) (citation omitted)). In the context of non-termination-based employment actions, the fifth prong can be satisfied by showing the plaintiff "was treated less favorably than similarly situated non-disabled employees". *Brady v. Potter*, 273 F. App'x 498, 502 (6th Cir. 2008).

Disability Discrimination Based on Anxiety and Depression

In Plaintiff's Complaint, he asserts he "suffered from physical and mental and emotional disabilities . . . includ[ing] long standing back problems, hernia issues, and anxiety issues." (Doc.

18, at ¶ 11). In his deposition, Plaintiff testified to diagnoses of generalized anxiety disorder, reactive depression (Plaintiff Depo., at 135-37) as well as physical issues (including a hernia and a back injury and subsequent surgery) (Plaintiff Depo., at 136, 142-47). At the outset, Defendant asserts that to the extent Plaintiff's disability discrimination claim is based on his anxiety and depression, Defendant is entitled to summary judgment.

As noted, one element of a plaintiff's *prima facie* case is that his employer "knew or had reason to know" of his disability. *Hrdlicka*, 63 F.4th at 566 (quoting *Williams*, 847 F.3d at 395); *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016). To make this showing, a plaintiff must show more than the decisionmaker's "general knowledge that a disability exists." *Tennial*, 840 F.3d at 306. Rather, the decisionmaker should be aware "of the specifics of an employee's disabilities or restrictions." *Id.* To that end, it is also not sufficient for a plaintiff to show that the employer had knowledge of an employee's symptoms. *Hrdlicka*, 63 F.4th at 567 ("A general awareness of some symptoms is not enough to show that the defendant knew of the plaintiff's disability." (internal citation omitted)). As the Sixth Circuit has explained, "[i]n the typical case, an employer has notice of the employee's disability when the employee tells the employer that he is disabled. Of course, the employee need not use the word 'disabled,' but the employer must know enough information about the employee's condition to conclude that he is disabled." *Cady v. Remington Arms Co.*, 665 F. App'x 413, 417 (6th Cir. 2016). Relevant information can include "a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." *Id.*

Plaintiff testified that he was diagnosed with generalized anxiety disorder in June 2018 and reactive depression in December 2016. (Plaintiff Depo., at 135-36). But he admitted he told no one in Defendant's management about these conditions. *Id.* at 147. He said, "I think they

know the same thing, there's days where I feel like I'm wired just from all the anxiety and stuff and, I'll be, I guess I work harder and faster." *Id.* at 147. He further testified these conditions did not interfere with his ability to perform his job. *Id.* at 148. Plaintiff characterizes his testimony as that he "testified that [Defendant was] aware of his anxiety through interactions with him, even though he never specifically articulated that he suffered from anxiety." (Doc. 35, at 10). He cites no additional evidence that Defendant was aware of his anxiety or depression conditions.

The Court agrees with Defendant that Plaintiff has failed to present an issue of triable fact on the third prong of his *prima facie* case as to these conditions, and Defendant is entitled to summary judgment thereon. Plaintiff testified he told no one about his conditions, and the conditions did not interfere with his work performance. The fact that he might be "wired" and "work harder and faster" is not sufficient to put Defendant on notice of his anxiety and depression. *See Hrdlicka*, 63 F.4th at 567. The remaining analysis below as to disability discrimination therefore only addresses alleged discrimination based on Plaintiff's physical impairments.[7]

Disqualification

The first action Plaintiff cites as allegedly discriminatory is his disqualification from the Lead Caster position. In moving for summary judgment, Defendant focuses on the fourth prong, arguing Plaintiff has not presented evidence that he was replaced by someone outside the protected class or otherwise treated differently than similarly-situated employees outside the protected class for either an age or disability discrimination claim. Specifically, Defendant argues that it did not choose Baker to replace Plaintiff, but rather Baker was selected pursuant to the CBA's contractual bidding procedure. *See* Doc. 27, at 11 ("Because the Company had no

---

7. Defendant does not present any argument that it was unaware of Plaintiff's claimed physical disabilities.

input in the decision to select any particular employee to replace Plaintiff and Plaintiff's replacement was instead selected pursuant to the contractual bidding procedure containing in the CBA, Plaintiff cannot establish that he was replaced by an employee outside the protected class.").[8]

In support, Defendant cites two cases: *MacDonald v. UPS*, 430 F. App'x 453, 459 (6th Cir. 2011) and *Wingo v. Mich. Bell. Tel. Co.*, 2019 U.S. Dist. LEXIS 25, at *32 (E.D. Mich.). In *MacDonald*, the Sixth Circuit explained, in the context of an age discrimination suit, that "[Plaintiff's replacement] was not hired by management for the position, but acquired the position pursuant to a collective bargaining agreement. . . . Ordinarily, a replacement selected pursuant to a collective bargaining agreement does not give rise to an inference of discrimination." 430 F. App'x at 459.[9] For this proposition, the court cited an unpublished Sixth Circuit case, *Mlinaric v. Parker Hannifin Corp.*, 853 F.2d 927, 1988 WL 81681, at *5 (6th Cir.). In *Mlinaric*, an ADEA case, the Sixth Circuit noted that although the 46 year old plaintiff demonstrated that he was replaced by a 29 year old, "plaintiff was replaced by a 29 year-old employee, not by defendant's choosing, but by operation of the CBA." 1988 WL 81681, at *5. Combining this with the plaintiff's "little showing that he was qualified for the position", the

---

8. In a footnote, without further argument, Defendant states that "[n]otably" Baker was in his late 40s or early 50s at the time he got the position, while Plaintiff was 58 years old; Plaintiff agrees, citing the same evidence. (Doc. 27, at 11 n.11); (Doc. 35, at 5). *See* Phipps Depo., at 156 (stating that Baker was five to eight years younger than Plaintiff, but that he was "guessing on that"); Downing Depo., at 33-34 (giving a "rough estimate" that Baker was 51 or 52); Tisovic Depo., at 24 (stating he had "looked it up yesterday" and "I believe he's roughly 50 right now."). The Sixth Circuit holds that "an age difference of six years or less between an employee and a replacement is not significant." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003). Thus, it appears this case is just past the bright line six-year difference rule the Sixth Circuit has established. And Defendant has not argued Plaintiff cannot establish the fourth prong of his *prima facie* case based on the age difference.

9. *MacDonald* applied Michigan disability discrimination law, but this law "substantially mirrors" the ADA and such claims are "generally analyzed identically" to ADA claims. *Hrdlicka*, 63 F.4th at 566.

*Mlarnic* court found the trial court did not err in granting a directed verdict for the defendant. *Id.* at *5-6. In *Wingo*, relying on *MacDonald*, a race discrimination case, the district court found the plaintiff failed to demonstrate a question of fact as to whether he was replaced by an individual outside his protected class when the collective bargaining agreement dictated the replacement. 2019 U.S. Dist. LEXIS, at *32.

In *MacDonald*, after stating that replacement of a younger individual pursuant to a collective bargaining agreement "ordinarily . . . does not give rise to an inference of discrimination", the court continued:

> Here, MacDonald testified that Gaffney inquired into Vinnay's interest in the job before MacDonald was fired, which, viewed in the light most favorable to MacDonald, suggests that UPS knew Vinnay was next in line and fired MacDonald only upon confirming that he would be replaced by a younger worker. However, MacDonald's testimony was that Vinnay had told MacDonald that Gaffney had previously asked Vinnay about his interest in MacDonald's job. This is pure hearsay and is inadmissible for purposes of summary judgment, . . . and Vinnay's affidavit, which is extremely favorable to MacDonald's position, makes no mention of the alleged inquiry. Accordingly, the fact that MacDonald was replaced by Vinnay, less than nine years his junior, pursuant to the collective bargaining agreement, does not by itself give rise to an inference of unlawful discrimination.

430 F. App'x at 459-60 (internal citation omitted). Thus, *MacDonald* suggests that an employee replaced by another pursuant to the terms of a CBA must show something more than simply that a younger person ultimately filled the role, such as evidence the employer was aware that a younger individual was next in line, or likely to be selected to fill the position, in order to establish the fourth prong of a *prima facie* case.

Again, the fourth prong of a *prima facie* case requires Plaintiff to provide evidence of "circumstances that support an inference of discrimination." *Swierkiewicz*, 534 U.S. at 510. And one way to show such circumstances is to show replacement with a significantly younger individual. *Grosjean*, 349 F.3d at 336. But, *MacDonald* says, replacement of a younger

19

individual pursuant to a collective bargaining agreement "ordinarily . . . does not give rise to an inference of discrimination". 430 F. App'x at 459. Plaintiff does not expressly respond to Defendant's argument on this point, but simply states he "was disqualified from his position and then replaced by a significantly younger individual." (Doc. 35, at 5). Plaintiff has not pointed to any evidence to suggest Defendant was aware that Baker would be his replacement.

As to the age discrimination claim, therefore, the Court finds Plaintiff has not presented a genuine issue of material fact as to the fourth prong of his *prima facie* case; that is, he has not pointed to "circumstances that support an inference of discrimination." *Swierkiewicz*, 534 U.S. at 510; *MacDonald*, 430 F. App'x at 459. Nevertheless, given the novelty of the issue and relative dearth of case law thereon, the Court will proceed to the second and third steps of the *McDonnell Douglas* test. As discussed *infra*, the Court finds that even if Plaintiff could establish a *prima facie* age discrimination case as it relates to his disqualification, he has not presented a question of fact regarding pretext.

Defendant presents the same argument with respect to Plaintiff's disability discrimination claim related to his disqualification: "[T]he Company did not replace him. Rather he was replaced by operation of the contractual bidding procedure contained in the CBA." (Doc. 27, at 18). The Court, however, finds this argument does not go as far in this context as it did above. The elements of a disability discrimination claim differ from those in an age discrimination claim. To show disability discrimination, Plaintiff must show his position remained open, or he was replaced. *Hrdlicka*, 63 F.4th at 566. Although courts often characterize the showing that Plaintiff must show replacement by a person outside the protected class, the Sixth Circuit has explained that considering "the somewhat unique characteristics of various disabilities, and the differences between individuals afflicted with a particular disability, replacement of one disabled

individual with another disabled individual does not necessarily weaken the inference of discrimination . . . ." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185 n.11 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012); *see also Erwin v. Honda N. Am., Inc.*, 2022 WL 3716561, at *10 (S.D. Ohio) ("While the standard test is phrased to focus on the replacement hire, in recent cases a caveat typically follows: the element "may also be satisfied by showing that similarly situated non-protected employees were treated more fairly." (quoting *Bullard v. Fedex Freight, Inc*., 218 F. Supp. 3d 608, 617 (M.D. Tenn. 2016)) (further internal quotations omitted).

At the outset, Plaintiff points to no evidence regarding whether Baker was or was not disabled; he focuses solely on the fact that Baker was younger. And, again, as described above, Plaintiff's replacement was selected pursuant to the CBA, not through any direct decision by Defendant. But even if Plaintiff could establish a *prima facie* disability discrimination case in a different manner, as discussed *infra*, the Court finds Plaintiff has not established a question of fact regarding pretext.

Increased Monitoring / Surveillance

As to Plaintiff's claim that Defendant's increased monitoring constituted age or disability discrimination, Defendant argues (1) Plaintiff has nothing more than his own speculation to support such a claim and the evidence is to the contrary, and (2) even if Plaintiff could demonstrate a question of fact about increased surveillance, Sixth Circuit caselaw holds that increased monitoring is not an adverse employment action.

Defendant is correct that heightened surveillance or scrutiny is not an adverse employment action. *Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 494 (6th Cir. 2017) ("Increased surveillance and discipline, whether warranted or not, do not constitute a material

adverse change in the terms of employment in the discrimination context because those actions do not "constitute[ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008)); *Birch v. Cuyahoga Cnty. Prob. Ct.*, 392 F.3d 151, 169 (6th Cir. 2004) ("increased scrutiny of [employee's] work . . . [is] not tantamount to adverse employment action[]"); *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999) (monitoring plaintiff more closely than non-protected class employees not adverse employment action).

Plaintiff seemingly attempts to argue that Defendant used the increased surveillance to discipline him. *See* Doc. 35, at 6. He cites one such instance where he was disciplined for failing to wear his personal protective equipment properly and contends he was disciplined for this outside the time provided for by the CBA. *Id.* (citing Plaintiff Depo., at 37-39). But he presents no evidence regarding increased or disproportionate video monitoring. And he admits he has no actual knowledge of how video monitoring was used. (Plaintiff Depo., at 38-39, 154-55). And even if he could demonstrate adverse action based on the cited discipline[10], he presents no evidence that this treatment was different than any similarly-situated comparator. In fact, Plaintiff's own testimony was that Defendant "catch[es] people on cameras all the time, you know, or on their phones all the time and it's usually Tisovic doing the, doing it." (Plaintiff Depo., at 155). Thus, he tacitly admits he was not treated differently than others.

As Plaintiff has not established a *prima facie* case, Defendant is entitled to summary judgment on Plaintiff's claims of age and disability discrimination based on video surveillance.

---

10. And discipline alone is not an adverse employment action either, absent a "significant change in employment status . . . or a decision causing a significant change in benefits." *Lee*, 676 F. App'x at 494 (internal quotation omitted)

<u>Failure to Assign Additional Caster Helpers</u>

The third allegedly discriminatory action Plaintiff identifies is Defendant's alleged failure to assign additional Caster Helpers. Defendant asserts that Plaintiff has not cited facts to establish an adverse action, and even if he had, he has not shown he was treated less favorably than similarly situated comparators in this respect.

Defendant asserts that refusal to provide additional assistance with job duties to lighten a heavy workload is not an adverse employment action. (Doc. 27, at 14). For this proposition, it cites *Kendall v. Dep't of Veterans Affairs*, 2018 WL 6605420 (S.D. Ohio) and *Shivers v. Charter Commc'ns, Inc.*, 2023 WL 3244781 (6th Cir.). In *Kendall*, the Court found a plaintiff's argument that she was overworked "in and of itself, and without more developed argumentation" was "insufficient to demonstrate an adverse employment action." 2018 WL 6605420, at *7. In support, the *Kendall* court cited three Circuit Court cases finding workload claims not adverse actions. *See Ellis v. Compass Grp. USA, Inc.*, 426 F. App'x 292, 296 (5th Cir. 2011) ("[i]mposing a higher workload than that given to other employees is not an adverse employment action"); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007) ("[a]bsent any evidence suggesting that discrimination motivated work distributions, the mere fact that an employee . . . had a heavier workload than her co-workers does not amount to an adverse employment action"); *Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 609 (11th Cir. 2008) (concluding that being subject to an increased workload did not amount to an adverse employment action). And in *Shivers*, the Sixth Circuit rejected the plaintiff's argument that an increased workload (among other things) amounted to an adverse action. 2023 WL 3244781, at *7. Other courts within the Sixth Circuit agree. *See Jones v. Donahoe*, 2013 WL 4042039, at *3 (W.D. Ky.) ("The definition of a materially adverse employment action typically involves a

23

decrease in responsibilities, job duties, or benefits. A substantial increase in [workload] alone does not qualify as a materially adverse change.").

Plaintiff again does not provide any acknowledgement of or argument in response to this caselaw. He simply argues he was "treated less favorably than others when an additional caster helper was not assigned", cites his testimony that he sometimes only had a single Caster Helper, that he needed and asked for help, and that his younger replacement was given help. (Doc. 35, at 6) (citing Plaintiff Depo., at 35, 122, 157, 158) He then concludes: "Therefore, there are questions of material fact as to whether Mr. Phipps suffered an adverse action and was treated less favorably than younger casters." (Doc. 35, at 6). Notably, Plaintiff's argument in this regard appears to only assert this purported "adverse action" based on age, not on disability. *See id.* at 6, 10.

As best the Court can tell, Plaintiff's argument on this point is two-fold: first, that he was discriminated against when he was in his role as Lead Caster; and second, that he was treated differently in comparison to his replacement. As to the first argument, the Court agrees with Defendant that Plaintiff has not presented evidence that he was treated differently than others in his role as Lead Caster. The evidence reflects he had more Caster Helpers than the Lead Caster on the A Crew. Second, as to either claim, the Court agrees with Defendant that a heavy workload, or wanting additional assistance to help with that workload and not receiving it is not an adverse employment action, particularly "absent any evidence suggesting that discrimination motivated work distributions." *Fane*, 480 F.3d at 539. A heavy workload is simply not the type of "material[ly] adverse change in the terms of employment" because it does "constitute[ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in

benefits.'" *Lee*, 676 F. App'x at 494 (quoting *White*, 533 F.3d at 402). Moreover, as set forth below, even if Plaintiff could establish a *prima facie* case regarding the assignment of Caster Helpers as a materially adverse action, the Court finds he has not shown pretext.

<u>Legitimate Non-Discriminatory Reason</u>

Even assuming Plaintiff could establish a *prima facie* case of either age or disability discrimination, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its actions. An employer's burden is one of production, not of persuasion; it need only state a reason, not prove one. *Burdine*, 450 U.S. at 254–55; *see also Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) ("This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." (citation omitted)). Defendants have satisfied this limited burden of production. "When an employer offers nondiscriminatory reasons for an adverse employment action, the burden shifts back to the employee to prove that the stated reason for [his] termination is pretextual." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012).

Defendant asserts (1) Plaintiff "was disqualified due to his increasingly poor performance"; (2) management denied singling out Plaintiff and subjecting him to increased scrutiny, and they only discovered video evidence of Plaintiff's poor performance during the course of investigating other production delays; and (3) the decision regarding the number of caster helpers assigned was based on changing needs and attrition, not Plaintiff's age or disability. (Doc. 27, at 14-15). Because Defendant has articulated legitimate, non-discriminatory reasons for its actions, the burden shifts back to Plaintiff to establish pretext.

Pretext

Defendant asserts Plaintiff cannot show any of these reasons were pretext for discrimination and that his own testimony demonstrates his claims are "wholly based on his own personal beliefs, assumptions and speculation." (Doc. 27, at 15). Plaintiff responds that he has identified sufficient evidence to create a triable issue of fact regarding pretext. His argument in this regard focuses almost exclusively on his disqualification claim, with a short mention of the additional Caster Helper claim. *See* Doc. 35, at 7-8.[11]

To show pretext, the "ultimate inquiry" is this: "did [Defendant act] for the stated reason or not?" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). To answer that question and establish pretext, plaintiffs typically establish one of three things: (1) that the employer's proffered reason "had no basis in fact," (2) that the proffered reason "did not actually motivate the employer's action," or (3) that the proffered reason was "insufficient to motivate the employer's action." *Chen*, 580 F.3d at 400. But these are not the only ways that a plaintiff can establish pretext; these three categories are simply a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Tingle*, 692 F.3d at 530 (quoting *Chen*, 580 F.3d at 400). So plaintiffs remain free to pursue arguments outside these three categories. Even so, a plaintiff must articulate some cognizable explanation of how the evidence she has put forth establishes pretext. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). Ultimately, a plaintiff must produce "sufficient evidence from which a jury could reasonably reject" Defendant's proffered reason for its actions. *Id.* (quoting *Chen*, 580

---

11. Because Plaintiff presents no argument regarding the pretext element for his heightened surveillance claim, and the Court above finds Plaintiff has not established an adverse employment action based thereon, the Court does not address pretext as to this claim.

F.3d at 400); *see also Chen*, 580 F.3d at 400 n.4 ("at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination").

*Disqualification*

Plaintiff – attempting to rely on the first method of proving pretext – argues that the reasons for his disqualification were not supported, citing his own testimony. The Court, however, agrees with Defendant that Plaintiff's subjective disagreement with Defendant's reasons, or Plaintiff's justifications for his actions, do not create a question of fact regarding whether Defendant's actions were pretext for discrimination.

"Disagreement with evaluation is not a valid basis for establishing pretext, *Brown [v. Kelsey-Hayes Co.*, 814 F. App'x [72,] 81 [6th Cir. 2020], as disagreement with something does not equate to it being false." *Meyrose v. Vitas Hospice Servs., LLC*, 2021 WL 5139478, at *7 (E.D. Ky.), *aff'd*, 2022 WL 3046969 (6th Cir.); *see also Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725–26 (6th Cir. 2012) ("Though Lefevers disputes aspects of the contents and context of the performance appraisals, his disagreement with GAF's 'assessment of his performance . . . does not render [GAF's] reasons pretextual.'") (quoting *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990)); *Hedrick v. W. Reserve Cas. Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (noting that disagreement with what an employee's supervisor considers important to an employee's job performance is not enough to show pretext). And "a subjective qualification assessment does not convert an otherwise legitimate reason into an illegitimate one." *Brown v. Ohio State Univ.*, 616 F. Supp. 2d 740, 751 (S.D. Ohio 2009) (quotation and citations omitted) (granting summary judgment to an employer when the employer stated that it terminated an employee, in part, because of her "failure of day to day decision making" and "lack of personal ownership"), *aff'd*, 385 F. App'x 486 (6th Cir. 2010); *see also Wortham v. Integrated Health*

27

*Servs.*, 302 F. Supp. 2d 854, 859 (N.D. Ohio) ("The use of subjective criteria in evaluating articulated reasons is not per se illegal in rebutting a plaintiff's prima facie case.") (granting employer summary judgment after employer justified termination because the employee "was not a team player and a leader").

Again, Defendant cited Plaintiff's performance as the basis for disqualification. Plaintiff admitted to, for example, the actions leading to his discipline in March 2020 and July 2020. (Plaintiff Depo., at 25-26, 37-38, and 70-71). Moreover, although Plaintiff offered justifications or explanations for his actions as compared to the reasons listed in his Letter of Disqualification, these explanations do not demonstrate Defendant's reasons "had no basis in fact," *Chen*, 580 F.3d at 400; Nor do they demonstrate the proffered reasons "did not actually motivate the employer's action," or were "insufficient to motivate the employer's action." *Id.*

Finally, Plaintiff relies on the statement from Turner that Phipps was "getting too old for this" as "evidencing a discriminatory animus towards [him], regardless of when the comment was made." (Doc. 35, at 8). Although Turner is a decisionmaker, the Court agrees with Defendant that this single remark is insufficient to establish a question of fact regarding pretext. This is so because the comment was isolated, not related to Plaintiff's disqualification, and made *after* Plaintiff's disqualification. *See, e.g.*, *Skelton v. Sara Lee Corp.*, 249 F. App'x 450, 455 (6th Cir. 2007) ("[T]here is no evidence that Gibson's statement was in any way *related* to Defendant's decision-making process in terminating Skelton."); *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 379 (6th Cir. 2002) (finding an "isolated remark" that was "remote in time" to be insufficient to show pretext in an age-discrimination case).

*Assignment of Caster Helpers*

As to the assignment of Caster Helpers, Defendant asserts the number assigned "was based on changing business needs and attrition, not Plaintiff's age or disability." (Doc. 36, at 12). It cites Downing's testimony that (1) when he first started as Supervisor, he had three Caster Helpers, but currently only had one; and (2) that "[w]hat happened . . . is, through attrition as people retire we do not replace them." (Downing Depo., at 10, 12, 15). It further cites Tisovic's testimony that demand varied over time. (Tisovic Depo., at 9-11); *see also* (Bostic Depo., at 8-9) (testimony that the number of Caster Helpers has "slowly dwindled down" from three or four to one; "Guys have retired, and they haven't filled the jobs.");

In response, Plaintiff, in essence, repeats his argument regarding *prima facie* case: that he was treated differently than someone younger. *See* Doc. 35, at 8 ("Plaintiff was immediately replaced by a younger man, and he was immediately given another young caster."). But this does not speak to (or undermine) Defendant's non-discriminatory reason. That is, even taking the facts in the light most favorable to Plaintiff, demonstrating that he was replaced by a younger individual who was given additional help does not show pretext for discrimination. It does not demonstrate (1) that the employer's proffered reason "had no basis in fact," (2) that the proffered reason "did not actually motivate the employer's action," or (3) that the proffered reason was "insufficient to motivate the employer's action." *Chen*, 580 F.3d at 400.

Indeed, Plaintiff's own testimony confirmed and acknowledged that the number of Caster Helpers sometimes varied based on employees' personal circumstances. *See* Plaintiff Depo., at 20 ("It could go down to one if we had a bad weekend where a lot of people took off."); 34 ("[W]e had a lot of people who came on the weekend shift and didn't show up for work because of physical, or Johnny passed away and that was never replaced".); 35 ("Obviously Johnny

passed away and then we had Jeff was very frequently taking off because of physical issues with his knee or something, I believe. And he was preparing for retirement anyway. Joe retired, you know, and so we got down to where it was a very short staff. . . . There was times where it got down to one."); 60 (noting a Caster Helper was not replaced when he passed away).

Thus, even to the extent Plaintiff can establish a *prima facie* case of age discrimination based on the assignment of Caster Helpers (or Casters), the Court finds he has not shown a question of fact regarding whether Defendant's reasons behind staffing assignments were pretext for illegal discrimination.

Labor Management Relations Act § 301 Claim / Sur-Reply Arguments

In its original brief, Defendant argued that "by dismissing his claims against the Union, Plaintiff also dismissed his associated breach of contract and civil conspiracy claims against the Company, as such claims are dependent claims." (Doc. 27, at 7). In his sur-reply, Plaintiff argued this was incorrect, and that his dismissal of claims against the unions "does not prevent him from pursuing his § 301 claim against the company." (Doc. 39, at 2). Defendant then responded, arguing "[e]ven assuming Plaintiff is correct regarding the ability to assert a Section 301 claim against a party and non-party, he still must prove **both** that (1) the Company breached the CBA; and (2) the Union breached its duty of fair representation." (Doc. 40, at 1) (emphasis in original). Defendant then provided arguments not included in its original brief as to why Plaintiff could not prove either. *See id.* at 1-6. Because these were new arguments, and in the interests of judicial economy and addressing the entire case, the Court granted Plaintiff further leave to respond thereto and he did so. *See* Doc. 44. For the reasons set forth below, the Court finds Defendant is also entitled to summary judgment on the § 301 claim.

As to Defendant's original argument, the Court finds Plaintiff is correct that the dismissal of his claims against the unions does not prevent him from proceeding on a § 301 claim against Defendant (and Defendant seemingly no longer argues the point, *see* Doc. 40). *See Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003) ("It is of no consequence that Garrison has already settled with Local 327. In a hybrid § 301 suit, an employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both.'") (quoting *DelCostello v. Int't Broth. of Teamsters,* 462 U.S. 151, 165 (1983)).

"[A] hybrid claim requires proof of both breach of the union's duty and breach of the CBA by the employer[.]" *Blesedell v. Chillicothe Tel. Co.*, 811 F.3d 211, 220 (6th Cir. 2016). "Unless a plaintiff 'demonstrates both violations, he cannot succeed against either party.'" *Garrison*, 334 F.3d at 538 (quoting *Bagsby v. Lewis Bros. Inc. of Tenn.,* 820 F.2d 799, 801 (6th Cir. 1987)).

"To determine if the CBA was breached, we look to the plain meaning of the agreement." *Roeder v. Am. Postal Workers Union, AFL-CIO*, 180 F.3d 733, 737 (6th Cir. 1999). "[T]o prove a breach of the duty of fair representation, an employee must demonstrate that the union's actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith." *Garrison*, 334 F.3d at 538 (citing *Vaca v. Sipes,* 386 U.S. 171, 190 (1967)). "In order to successfully defend against a motion for summary judgment on a duty of fair representation claim, the plaintiff must point the court to evidence in the record supporting at least one of these elements." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 619 (citing Fed. R. Civ. P. 56(e)).

Arbitrariness is a high standard. As the Sixth Circuit has summarized:

With regard to the arbitrary prong, "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's

31

> behavior is so far outside a 'wide range of reasonableness' as to be irrational."
> [*Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. [65,] 67, 111 S.Ct. 1127 [(1991)]
> (citation omitted). Mere negligence on the part of a union does not satisfy this
> requirement. *United Steelworkers of Am. v. Rawson,* 495 U.S. 362, 372–73, 376,
> 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990). Moreover, ordinary mistakes, errors, or
> flaws in judgment also will not suffice. *See Walk v. P\*I\*E\* Nationwide, Inc.,* 958
> F.2d 1323, 1326 (6th Cir.1992) (citations omitted). That is, "an unwise or even an
> unconsidered decision by the union is not necessarily an irrational decision." *Id.*

*Garrison*, 334 F.3d at 538-39. Further, to be found discriminatory, the union's conduct must be

"invidious, or 'based upon impermissible or immutable classifications such as race or other

constitutionally protected categories, or arises from prejudice or animus.'" *Dragomier v. Local*

*1112 Int'l Union United Auto. Aerospace & Agric. Implement Workers of Am.*, 64 F. Supp. 3d

1033, 1054 (N.D. Ohio 2014) (quoting *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349,

1359-60 (10th Cir. 1994)). Finally, "a union acts in bad faith if 'it acts with an improper intent,

purpose, or motive . . . encompass[ing] fraud, dishonesty, or other intentionally misleading

conduct.'" *Id.* at 1055 (quoting *Merritt*, 613 F.3d  at 619).

> As to the union's duty of fair representation, Plaintiff argues:

> After the action of the Company in disqualifying Plaintiff from his long time
> position as Lead Caster, the . . . . Unions pursued grievance number 730 on
> Plaintiff's behalf. On December 15, 2020, the company and union met and
> entered into an agreement which provided that Plaintiff would be evaluated at 90
> and 180 working day increments from the date of his disqualification and that
> only if his performance and execution as Caster Helper was acceptable, he would
> be allowed to begin training in the role of Lead Caster.

(Doc. 44, at 4-5). Plaintiff asserts this action was "arbitrary, discriminatory, and bad faith

conduct which was and is devoid of rational basis when it allowed the Company to disqualify

Plaintiff from his long time position as Lead Caster, in direct contravention to the CBA." *Id.* at 5.

In support of his argument that there is a question of fact regarding whether the union acted with

discrimination or in bad faith, Plaintiff states Tisovic "testified that the union doesn't believe

anyone should ever be disqualified, and that it always contends that camera footage should not

be used in discipline." *Id.* He further contends that Tisovic could not recall such arguments being made in this case. *Id.* But Tisovic's testimony simply reflects that the Union protests various actions by Defendant:

> Q: All right. I take it the union protested, they protest the use of video?
>
> A: The union protests the use of anything, but yes.
>
> Q: Okay.
>
> A: But the union has agreed to use of video investigations. Okay. I got a signed document from the union for that.
>
> * * *
>
> Q: Is there any reason [Plaintiff] didn't go back to his last bid job?
>
> A: I would have to look at the contract and look at the language exact. I don't recall right off the top of my head.
>
> Q: Okay. So the contract would govern that, where he should have gone?
>
> A: We would have followed the contract in that.
>
> Q: Do you know did the union protest putting him in general labor?
>
> A: The union protests everything.

(Tisovic Depo., at 15, 16).

Plaintiff seemingly contends that these statements that "the union protests everything" in conjunction with the fact that the union did not make these specific arguments in response to his July 2020 discipline, or his disqualification demonstrates a question of fact regarding whether the union acted violated its duty of fair representation. He further contends the settlement of his grievance was in contravention of the CBA's terms and objects to the union's settling his grievance "with no input from the Plaintiff". (Doc. 44, at 5). The Court finds Plaintiff has not established a genuine issue of material fact regarding a duty of fair representation claim.

33

The Court finds Tisovic's testimony does not create a dispute of fact regarding whether the union acted arbitrarily (that is, "so far outside a 'wide range of reasonableness' as to be irrational", *O'Neill,* 499 U.S. at 67), discriminatorily (that is, "invidious, or 'based upon impermissible or immutable classifications such as race or other constitutionally protected categories, or arises from prejudice or animus." *Dragomier*, 64 F. Supp. 3d at 1054 (internal quotation omitted) or in bad faith (that is, "with an improper intent, purpose, or motive . . . encompass[ing] fraud, dishonesty, or other intentionally misleading conduct", *id.* at 1055).

Further, to Plaintiff's final point, as Defendant correctly notes, the Sixth Circuit has explained that "a union does not breach the duty of fair representation by failing to consult with a worker before settling his grievance." *Courie v. Alcoa Wheel & Forged Prod.*, 577 F.3d 625, 631 (6th Cir. 2009); *see also Martin v. AK Steel Corp.*, 2017 WL 631915, at *5 (E.D. Mich.) ("allegations that the UAW settled [a plaintiff's] grievance against his wishes, standing alone, does not state a plausible claim for relief under Section 301").

Because Plaintiff has not established a question of fact regarding the duty of fair representation claim within his hybrid § 301 claim, the Court need not reach the parties' dispute regarding breaches of the CBA, and Defendant is entitled to judgment on this claim. *See Garrison*, 334 F.3d at 538 ("Unless a plaintiff 'demonstrates both violations, he cannot succeed against either party.'") (quoting *Bagsby*, 820 F.2d at 801).[12]

---

12. Plaintiff's Amended Complaint also stated a claim for civil conspiracy under Ohio law. *See* Doc. 18, at 7. "[A]n underlying unlawful act is required before a civil conspiracy claim can be successful." *Gosden v. Louis*, 687 N.E.2d 418, 496 (Ohio Ct. App. 1996) (citing *Minarik v. Nagy*, 193 N.E.2d 280, 280–81 (Ohio 1963)). Because the Court grants summary judgment to Defendant on both Plaintiff's discrimination and § 301 claims, there is no underlying unlawful act and Defendant is entitled to judgment on this claim as well.

**CONCLUSION**

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant's Motion for Summary Judgment (Doc. 27), be and the same hereby is, granted.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: June 11, 2024